IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

VICTOR ROBINSON,

OPINION AND ORDER

          Plaintiff,

20-cv-28-bbc

     v.

RANDALL EDWARDS, MATTHEW SCULLION,
DANE ESSER, CODY SAYLOR, LEBBEUS BROWN,
ANTHONY BROADBENT, MELANIE KUSLITS AND
CORENE GIEBEL,

          Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

     Pro se plaintiff Victor Robinson, who is incarcerated at the Green Bay Correctional Institution, is proceeding on: (1) Eighth Amendment and state law negligence claims against defendants Randall Edwards, Matthew Scullion, Dane Esser, Anthony Broadbent, Lebbeus Brown and Cody Saylor regarding another inmate's alleged attack of plaintiff at the Wisconsin Secure Program Facility on January 2, 2018; and (2) a First Amendment access to courts claim against defendants Melanie Kuslits and Corene Giebel for their alleged refusal to notarize his notice of claim form, which prevented him from complying with Wisconsin's notice of claim statute. (I have amended the caption to reflect the correct spelling of defendants' complete names.)

     Before the court are the parties' cross motions for summary judgment. Dkt. ##34, 49. In addition, plaintiff recently filed a letter with the court in which he states that defendants have produced only a portion of the tape of an eight-hour gang debriefing interview that defendant Brown conducted with him in 2014. Dkt. #77. He contends that

defendants are in violation of this court's May 10, 2021 order compelling defendants to produce the tape.  Dkt. #76.

For the reasons below, I am denying plaintiff's motion for summary judgment, granting defendants' motion for summary judgment and closing this case.  Because the stated contents of the interview tape would not change the outcome of this case, plaintiff's recent discovery request will be denied as moot.

From the parties' proposed findings of fact, I find the following facts to be undisputed unless otherwise noted.

UNDISPUTED FACTS

A.  The Parties

At all times relevant to this lawsuit, plaintiff Victor Robinson was incarcerated at the Wisconsin Secure Program Facility, where many of the defendants were employed.

Defendant Lebbeus Brown was a captain and Security Threat Groups Coordinator from April 2003 to June 2016, and then a unit supervisor from June 2016 to August 2020 on the Alpha and Fox Trot housing units.  Defendant Anthony Broadbent has served as a unit supervisor on the Echo and Fox Trot housing units since 2014.  During the period relevant to this lawsuit, Dane Esser was a captain, Matthew Scullion was a lieutenant, Cody Saylor was a sergeant and Randall Edwards was a correctional officer.  Plaintiff was later incarcerated at the Waupun Correctional Institution, where defendant Corene Giebel was an offender records supervisor and defendant Melanie Kuslits was employed as an offender

records associate.

## B. Background

Plaintiff was a member of the Vice Lord Gang for over 50 years and was the highest ranking member of the gang in Wisconsin.  On September 15, 2014, while plaintiff was housed in a restrictive housing unit, he wrote a letter "to be sent to Chicago Ill, and the Federal System," denouncing his gang affiliation.  The letter stated that the only way out of the gang at plaintiff's level is death, and plaintiff's decision "put a target on his back." Defendant Brown intercepted the letter and issued plaintiff a conduct report, stating that plaintiff was a high-level gang member attempting to contact another high-level gang member in the federal prison system to denounce his gang affiliation.  Defendant Brown asked plaintiff if he would he go through a gang debriefing, and plaintiff agreed.  With permission from upper security, Brown interviewed plaintiff for about eight hours. (Although plaintiff has not yet had the opportunity to review the entire interview tape, he says that during the interview, he told Brown that the Vice Lords would attempt to harm or kill him for denouncing his gang affiliation.)  In a letter to plaintiff dated September 19, 2014, Warden Boughton acknowledged plaintiff's decision to leave the gang.  (Although plaintiff says that the entire staff at the prison was provided with the memorandum, he has not presented any evidence to support this assertion.  The letter itself states that certified copies were sent only to Brown, Captain Mason, "ICE" and "file."  Dkt. #73-9.)

In exchange for plaintiff's denouncing his gang membership, Brown told plaintiff that

he would support plaintiff's getting a job and a transfer to a less secure institution. However, according to plaintiff, Brown did not make good on his promise. After an emergency hearing with Brown and a social worker, at which plaintiff became angry and called Brown names, plaintiff was transferred to a medium security prison in South Dakota on September 10, 2015. He returned to the Wisconsin Secure Program Facility on August 4, 2016. For the next two years, plaintiff had interactions with various staff and administrators (not defendants) about his custody and placement classification. (Plaintiff proposes several facts related to his past interactions with certain defendants in early 2017, including their failure to support his participation in a prison mentor program, interfering with plaintiff's nonprofit organization, encouraging inmate Jamal Desmar Williams to make false statements against plaintiff and searching plaintiff's cell to seize gang-related materials, which were actually plaintiff's nonprofit paperwork. I have not considered those proposed facts because plaintiff was not allowed to proceed on any claims involving these past incidents, and they are not relevant to the dispositive issues in this case—namely, whether defendants had any reason to know that inmate Robert Collins posed a risk of serious harm to plaintiff on or after December 21, 2017, and whether they failed to take reasonable measures to prevent or stop the alleged attack on January 2, 2018.)

### C. Prison Housing Practices

It is common for inmates to be moved on and off the Fox Trot unit, depending on the inmate's status, unit availability, institution needs and available beds. The security director

and administrative captain generally make unit placement decisions.

The Department of Corrections has a system for documenting and tracking any special placement needs of inmates who may have problems with staff, other inmates or particular facilities.  Special placement concerns that have been investigated, evaluated and documented as supporting certain needs are referred to as Special Placement Needs or SPNs. If an inmate wants to request a SPN, he must complete a DOC-1803 form.  Upon receipt of a DOC-1803, the security director assigns an investigator, who determines whether the SPN is warranted, based on qualifying criteria.

The security office considers any security concerns, including SPNs, when moving an inmate from one unit to the next.  When an inmate is released from restrictive housing status, the security office determines that inmate's placements and informs the unit supervisor of the transfer.  When inmates are laterally transferred from one general population unit to another, the unit supervisor may be consulted prior to the move.

### D.  Plaintiff's Housing Assignments

On May 26, 2017, plaintiff was placed in restrictive housing on the Alpha unit for disobeying orders, disruptive conduct and possessing contraband.  At that time, inmate Robert Collins also was in the Alpha unit on the same range as plaintiff.  According to plaintiff, Collins told him during that time period that the Vice Lords were planning to kill plaintiff.  Plaintiff and Collins began arguing, and Collins threatened to "take up the hit" that the Vice Lords had put on plaintiff.  Collins continued to threaten plaintiff for two

weeks.

Although prison staff (plaintiff does not identify the staff by name) asked plaintiff about the argument that plaintiff had with Collins on May 26, 2017, plaintiff refused to answer them.  Plaintiff also refused to answer questions from defendant Brown because of what plaintiff perceived to be the past "bad blood" between them.  (The parties dispute what Brown knew about plaintiff's May 26 argument with Collins.  Plaintiff says that Brown asked him what his argument was with Collins, why Collins was threatening him and whether it was true that Collins was supposed to "take up the hit" that the Vice Lords placed on plaintiff.  Brown says that he does not recall such a conversation with plaintiff and denies knowing about any hit placed on plaintiff.)

At some point, plaintiff was transferred out of the Alpha unit and into general population on the Charlie unit, away from Collins.  There is no record that plaintiff ever filed a SPN regarding Collins.  On October 18, 2017, plaintiff was transferred from the Charlie unit to the Fox Trot unit, also in general population.  Collins was transferred from restrictive housing in the Alpha unit to restrictive housing in the Fox Trot unit on December 21, 2017.

In December 2017, defendant Brown was the supervisor for the Alpha unit and defendant Broadbent was the supervisor for the Fox Trot unit.  In addition, Brown helped oversee the restrictive housing inmates who were housed on the Fox Trot unit, which was sometimes used as overflow for inmates in restrictive housing.  Broadbent oversaw the general population inmates on the Fox Trot unit.  Both Brown and Broadbent would have

been informed of Collins's transfer to Fox Trot, but they did not order plaintiff's or Collins's transfer onto the unit.  Brown was not aware that plaintiff was housed on the Fox Trot unit as a general population inmate when Collins was transferred to that unit in December 2017. Broadbent does not recall whether he was consulted about plaintiff's transfer into the Fox Trot unit.

Defendants Esser, Scullion, Edwards and Saylor did not order either plaintiff's or Collins's transfer to the Fox Trot unit, and they do not have the authority to transfer an inmate from one unit to another unless it is to place the inmate in temporary lock-up.

### E.  January 2, 2018 Incident

On January 2, 2018, defendants Saylor and Edwards were working second shift (2:00 p.m. to 10:00 p.m.) on the Fox Trot unit.  Saylor supervised 100 inmates and four correctional officers.  Inmate movement on the unit occurs during recreation, meals and law library time.  Defendant Edwards's typical shift consisted of assisting with monitoring two sessions of recreation and dayroom time and assisting with inmate counts, medication passes, and mealtime.

Edwards usually conducted a security round promptly after retrieving his gear from the sergeant's station at the beginning of his shifts because the recreation and dayrooms would be occupied at this time and he wanted to get a sense of the environment for the day and make his presence known to the inmates.  He generally did a security round anytime there were inmates out for recreation or dayrooms.  Edwards did not skip making his rounds

on January 2, 2018.  Because he was working a double shift that day, one of the officers who just came on shift offered to take the first round.  Edwards was going to make a round after the inmates finished their meals and were let out to the dayroom and recreation areas.  The incident with plaintiff and Collins occurred just before Edwards was about to start his round.

At approximately 5:50pm, Edwards was finishing letting out Range 1 inmates to the dayroom and recreation when Saylor told Edwards to see what an inmate in cell 103 needed. After Edwards completed this task, he went back to the sergeant's cage to ask Saylor for the electronic device used to track and complete security rounds.  Edwards then saw inmate Collins standing at the top of Range 1.  He began walking toward Collins, who asked to be let back into his cell.  As Edwards got closer to Collins, he observed that Collins's coat and pants appeared to be covered in some sort of red liquid.  Edwards then turned to Saylor and told him that they needed a supervisor and support staff sent down to Fox Trot immediately.

Saylor called the control unit and told Sergeant Trefz that additional support and the health services unit were needed in the Fox Trot unit immediately.  Saylor started scanning the dayroom cameras and saw nothing wrong.  However, as he was looking through the camera monitors, he realized that he did not have a Range 2 vestibule camera on his monitor in the sergeant's cage.  Saylor looked at the Range 1 camera and saw that Edwards had locked inmate Collins into his cell.  Prior to this incident, Saylor was unaware that the Range 2 vestibule camera monitor was not working.  (Plaintiff attempts to dispute this fact by pointing out that Saylor stated in his incident report that "I did not have a Range 2 Vestibule camera on my monitor that I could see.  The unit hasn't ever since maintenance

8

had installed new monitors." Dkt. #53-5 at 2.  However the next sentence in the incident report reads, "I did not realize that until that time."  Id.)

At the time of the incident, the Fox Trot unit had multiple cameras.   Depending on what area Saylor was trying to monitor, he would have to toggle through the camera angles because not all of the cameras showed on the monitor at once.  There was nothing that indicated if a monitor was not working.  For example, Saylor did not receive a notification or a flashing warning that a camera was not showing up on the monitor.  The non-functional monitor would have shown only blue or black for that camera angle.  When a monitor goes out, someone puts in a work order to get it fixed by the maintenance staff.  Although Saylor's duties as a sergeant include monitoring the cameras, his other duties prevent him from doing so at all times.  It also is not Saylor's responsibility to check that the cameras are working at the beginning of every shift or to fix the monitors.

While Saylor was in the sergeant's cage trying to determine what was happening, Edwards started walking toward Collins and asked him whether he was ok.  Collins did not reply.  At that point, Edwards was close enough to observe a substance that looked like blood on Collins's shoes, so Edwards decided to lock Collins in his cell.  Once Collins was secured in his cell, Officer Rudie met Edwards on Range 1, and they followed the blood trail to try to figure out what had happened.  The blood trail led to the dayrooms on Range 1 and outside and continued to Range 2, where Edwards and Rudie found plaintiff sitting in a chair and bleeding from his face.  Edwards radioed for the health services unit to report to Fox Trot immediately.  Rudie and Edwards then began sending inmates from Range 2 back to

Range 1 to get locked back into their cells.

Defendant Scullion, the nursing supervisor, and several other officers arrived on the Fox Trot unit and went to find Edwards on Range 1. Defendant Esser also arrived at the scene with more officers. Scullion went back down the range and told Saylor to have someone get a wheelchair because there had been a fight and plaintiff was bleeding badly. Saylor was handed a pair of broken scissors with blood on them and a broken pair of eyeglasses. Saylor placed these items into an evidence bag. Saylor then put an officer near Range 1 and Range 2 to keep a timeline of everything that was going on and a record of everyone who was on the range.

Once Edwards secured all of the inmates on Range 1 as he had been ordered to do, he responded back to Range 2. He was instructed to retrieve a wheelchair from the Alpha unit. Plaintiff was assisted to a standing position and Officer Jorgenson conducted a pat search, finding no contraband. Plaintiff was then assisted into the wheelchair and escorted to the health services room on the Alpha unit, where medical staff assessed his injuries and checked his vitals.

Plaintiff told Edwards that Collins had asked him to come out to the dayroom because Collins had an important question to ask. Plaintiff agreed to go out and he met Collins on Range 1. Because Collins wanted to talk somewhere quieter, plaintiff and Collins went to Range 2. Collins started talking about something gang related, which plaintiff did not want to discuss. Plaintiff told Edwards that he attempted to disengage from the conversation when Collins began assaulting him.

In his incident report, defendant Esser stated that he observed stab wounds above plaintiff's left eye, right cheek, left shoulder, midsection, stomach and side area.  He also stated that because the incident involved a "pretty high profile inmate" and the unit was short on staff, the officers had the control center lock down the institution until further notice.

Defendant Brown was not the unit supervisor on Fox Trot on January 2, 2018, and he was not made aware of the incident between Collins and plaintiff until his next shift.  Defendant Broadbent also was not on duty at the time and learned of the incident during his next shift.

According to defendants Edwards and Saylor, there is not supposed to be a chair at the end of any range on the Fox Trot unit, but inmates often dragged a chair from the dayroom onto the range.  (There is some dispute as to whether officers ever sat in a chair on the range or at the end of the range inside the prison.  Plaintiff alleged in his complaint that during first shift recreation, staff sit "at the end of the range and outside during the whole period of recreation."  Dkt. #1 at ¶ 79.  Defendants admitted this allegation in their answer.  Dkt. #30 at 11.  Plaintiff went on to allege in his complaint that second shift staff "was not at the end of the range sitting in a chair that is there for them."  Dkt. #1 at ¶ 80.  Defendants denied that allegation.  Dkt. #30 at 11.  Saylor and Edwards also aver that under no circumstances would an officer sit in a chair on the range inside the prison because a typical shift would keep an officer busy with other duties and sitting in a chair in one spot could put an officer in a vulnerable and compromised position.)

F.  Defendants' Knowledge of Risk to Plaintiff

Prior to the January 2, 2018 incident, defendants Saylor and Edwards were not aware of plaintiff's gang affiliation, whether he had renounced his gang affiliation or whether anyone had placed a "hit" on him.  They also were not aware of any issues, arguments or threats between plaintiff and Collins, and as a result, they had no warning that Collins would attack plaintiff on January 2, 2018.  In the past, Saylor expressed concerns about Collins being in general population because of his anger problems and history of disruptive conduct.  (Plaintiff points out that Brown knew that Collins was caught with a homemade weapon while on administrative confinement in 2000 and 2016 and says that the other correctional officer defendants knew that Collins was an aggressive and violent inmate.)

Although defendants Broadbent, Esser and Scullion were aware that plaintiff had a gang affiliation, they did not know that plaintiff had renounced that affiliation.  Although Esser had heard something about plaintiff renouncing his affiliation with the Vice Lords, he did not know whether this was true.  Broadbent, Esser and Scullion also were not aware of any issues, arguments or threats between plaintiff and Collins and did not know about any "hits" placed on plaintiff for renouncing his gang affiliation.

Defendant Brown knew that plaintiff and Collins had argued while in restrictive housing on the Alpha unit.  According to Brown, Collins is a very argumentative inmate and argues with almost every person with whom he comes in contact.  (The parties dispute what Brown knew about Collins's risk to plaintiff.  Although Brown was aware that plaintiff had argued with Collins on the Alpha unit, Brown says that he did not see plaintiff and Collins

argue in a way that would have made Brown believe that Collins would attack plaintiff. Plaintiff says that Brown knew that Collins had threatened him and was going to "take up the hit" that the Vice Lords had placed on plaintiff. Brown says that he does not recall such a conversation with plaintiff and denies knowing about any hit placed on plaintiff. Plaintiff also says that he told Brown about the hit during his gang debriefing interview several years earlier.) Brown also admitted knowing that Collins had been caught with a home made weapon while on administrative confinement in 2000 and 2016.

### G.  Notice of Claim

Plaintiff filed one notice of claim regarding the January 2018 incident. The notice was postmarked May 22, 2018 and date-stamped as received on May 24, 2018. Plaintiff did not make an oath or affirmation as to the truthfulness of the contents of the notice, and it was not notarized.

Previously, plaintiff sent a letter dated April 24, 2018 to the Wisconsin Attorney General, stating that staff at the Waupun Correctional Institution refused to notarize his hand-written notice of claim. Dkt. #54-1. Attached was an unsigned and un-notarized, handwritten notice of claim, which did not identify defendants Brown and Saylor as participants in the January 2018 incident. Id.

The parties dispute the events leading up to plaintiff's April 24 letter. (Plaintiff alleged in his complaint that in late March or early April 2018, he asked defendant Kuslits to notarize his handwritten notice of claim with respect to his negligence claims against the

other defendants in this case.  Kuslits allegedly refused, stating that her boss, defendant

Giebel, told her that she could not notarize a handwritten notice of claim and that plaintiff

had to complete a standard, printed claim form.  Plaintiff alleges that he wrote to the notary

record office for his restrictive housing unit, asking to speak with Giebel about the matter,

but that he never received a response.  Defendants Kuslits and Giebel stated in response to

plaintiff's discovery requests that they did not recall the incident referred to by plaintiff, but

they admitted that Giebel had instructed Kuslits and other notary staff to check with

supervisory staff if they were unsure about whether to notarize a particular document.)

Because there was some confusion in the records office about whether it was

appropriate to notarize a handwritten notice of claim, Giebel sent two emails to her records

staff in May 2018, informing them that handwritten notices of claim should be notarized.

Kuslits received one of those emails on May 29, 2018.

## OPINION

### A. Eighth Amendment

#### 1. Legal standard

Under the Eighth Amendment, prison officials must "take reasonable measures to

guarantee the safety of . . . inmates," including protecting them "from violence at the hands

of other prisoners."  Farmer v. Brennan, 511 U.S. 825, 832-33 (1994) (internal citations

omitted).  See also LaBrec v. Walker, 948 F.3d 836, 841 (7th Cir. 2020) (citing same).  To

establish an Eighth Amendment violation, an inmate must show that a defendant was

14

deliberately indifferent to "an excessive risk to inmate health or safety." Sinn v. Lemmon, 911 F.3d 412, 419 (7th Cir. 2018) (quoting Gevas v. McLaughlin, 798 F.3d 475, 480 (7th Cir. 2015)). "This includes two components: (1) 'the harm to which the prisoner was exposed must be an objectively serious one;' and (2) judged subjectively, the prison official 'must have actual, and not merely constructive, knowledge of the risk.'" Id. However, courts give "a high degree of deference to the discretion of prison administration to 'adopt policies and practices to maintain the safety and security of this country's penitentiaries.'" Board v. Farnham, 394 F.3d 469, 477 (7th Cir. 2005) (citing Bell v. Wolfish, 441 U.S. 520, 548 (1979); United States v. Tokash, 282 F.3d 962, 970 (7th Cir. 2002)). See also Holleman v. Zatecky, 951 F.3d 873, 880 (7th Cir. 2020) (Courts "are not super-wardens who sit to critique the efficacy or wisdom of prison management choices.").

To show that a prison official had knowledge of a substantial risk to an inmate's safety in cases in which the inmate complains of threats from another inmate, the inmate must show that he complained about specific threats—vague statements about "having problems" or "needing to be removed" from a housing unit are not sufficient. Grieveson v. Anderson, 538 F.3d 763, 776 (7th Cir. 2008) (citing Butera v. Cottey, 285 F.3d 601, 606-07 (7th Cir. 2002)). See also Gevas, 798 F.3d at 480-81 ("Complaints that convey only a generalized, vague, or stale concern about one's safety typically will not support an inference that a prison official had actual knowledge that the prisoner was in danger."). Nonetheless, the Court of Appeals for the Seventh Circuit has held that even though "we have often found deliberate indifference where custodians know of threats to a specific detainee posed by a

specific source," we are not "constrained by this fact pattern."  Brown v. Budz, 398 F.3d 904, 915 (7th Cir. 2005).  "'It is well settled' that plaintiffs can adequately establish deliberate indifference in circumstances where 'the specific identity of the ultimate assailant is not known in advance of assault.'"  Sinn, 911 F.3d at 421 (citing Budz, 398 F.3d at 915). "[W]hat matters is the relevant defendant's subjective awareness, which includes the inmate's complaints along with any other information that defendant may have."  Id. Failure to take reasonable responsive actions in the face of subjective awareness of a serious risk to plaintiff amounts to deliberate indifference.  Id. at 422; LaBrec, 948 F.3d at 847.

In addition, plaintiff must show how each of the defendants was personally involved in the decision to house Collins on the same housing unit as plaintiff.  Kuhn v. Goodlow, 678 F.3d 552, 555-56 (7th Cir. 2012).  An individual cannot be held liable in a § 1983 action unless he or she caused or participated in an alleged unconstitutional deprivation of rights.  Pepper v. Village of Oak Park, 430 F.3d 805, 810 (7th Cir. 2005).

Defendants challenge plaintiff's failure-to-protect claims on the grounds that none of the defendants were responsible for the decision to house plaintiff and Collins in the same cell block and none were aware of any arguments between plaintiff and Collins or knew that Collins intended to harm plaintiff.  They also argue that defendants Saylor and Edwards did not act unreasonably on the night of the incident.  I address each argument separately below.

### 1.  Housing plaintiff with Collins

Plaintiff contends that defendants Brown, Broadbent, Scullion, Esser, Saylor and

16

Edwards knew that he had renounced his affiliation with the Vice Lords gang, that the gang had placed a hit on him and that inmate Collins—whom they knew had a history of violence—argued with plaintiff and threatened to carry out the hit on plaintiff.  He alleges that despite this knowledge, these defendants placed him or allowed him to be housed with Collins in the Fox Trot unit, where Collins attacked him on January 2, 2018.  However, as discussed below, plaintiff has failed to present sufficient evidence from which a reasonable jury could conclude that these defendants:  (1) had any personal involvement in placing plaintiff on the same unit as Collins; or (2) knew that plaintiff faced an excessive risk of attack from Collins or the Vice Lords when the two inmates ended up on the same housing unit in late December 2017.

A reasonable jury could not conclude from the evidence of record that any of the defendants were responsible for or participated in the transfer of plaintiff and Collins to the Fox Trot unit in late 2017.  It is undisputed that defendants Esser, Scullion, Edwards and Saylor did not order either plaintiff's or Collins's transfer to the Fox Trot unit, and they do not have the authority to transfer an inmate from one unit to another unless it is to place the inmate in temporary lock-up.  Although both Brown and Broadbent would have been informed of Collin's, and possibly plaintiff's, transfer to the Fox Trot unit, it is undisputed that they did not order the transfers.

There also is insufficient evidence to show that any of the defendants besides Brown knew anything about plaintiff's gang affiliation or interactions with Collins at the time the two inmates were housed together on the Fox Trot unit in December 2017.  It is undisputed

17

that defendants Saylor and Edwards did not know about plaintiff's gang affiliation, whether plaintiff had renounced his gang affiliation or whether anyone had placed a "hit" on plaintiff. Although defendants Broadbent, Esser and Scullion were aware that plaintiff had a gang affiliation, they did not know that plaintiff had renounced that affiliation and potentially faced a risk of harm for doing so. Although Esser had heard something about plaintiff's renouncing his affiliation with the Vice Lords, he did not know whether this was true. Plaintiff says that because defendants Esser and Scullion opposed his participation in the peer specialist program, they should have known that this participation prevented him from being affiliated with a gang. However, plaintiff has not presented any evidence to support this assertion. (The exhibit he cites in support of his proposed finding of fact related to this issue does not discuss the peer specialist program.)

In addition, apart from some vague and general knowledge about Collins being an aggressive and argumentative inmate who had once made homemade knives while in administrative confinement years earlier, there is no evidence in the record that Broadbent, Esser, Saylor and Edwards knew about any problems, arguments or threats between plaintiff and Collins or that they had any warning that Collins would attack plaintiff on January 2, 2018. In fact, plaintiff admits that he did not speak with *any* staff members about Collins's alleged threats in May 2017. He also never filed a SPN request to be housed apart from Collins or other members of the Vice Lords.

As for defendant Brown, it is undisputed that he knew that plaintiff had been a high-ranking member of the Vice Lords but had renounced his affiliation with the gang in 2014.

Although plaintiff has not yet had the opportunity to discover evidence that he expressly told Brown during that interview that he likely would face harm or retribution from the Vice Lords for renouncing his gang affiliation, it is reasonable to assume that Brown would have known, at least in 2014, that such a risk existed.  The parties also dispute whether Brown knew anything about a hit being placed on plaintiff or about Collins's threats to plaintiff in May 2017, in light of the fact that Brown allegedly asked plaintiff about Collins and the hit. (Although plaintiff contends that Brown likely would have said something to the other defendants about the alleged hit, this is nothing more than speculation on plaintiff's part, and thus insufficient to avoid summary judgment.  Miller v. Gonzalez, 761 F.3d 822, 827 (7th Cir. 2014) ("[S]peculation, hunches and intuition cannot defeat summary judgment."); Matthews v. Waukesha County, 759 F.3d 821, 824 (7th Cir. 2014) ("Although the plaintiff 'is entitled to the benefit of reasonable inferences, that does not extend to inferences that are supported only by speculation or conjecture.'").)

In any event, any knowledge that Brown or the other defendants may have had about a possible threat to plaintiff from the Vice Lords or Collins was too remote to support a reasonable inference that he continued to be at risk of an attack in January 2018.  Sandoval v. Doe 1, 2020 WL 2801503, at *3 (W.D. Wis. May 29, 2020) ("Without more, knowledge of the 2008 assault was too remote to support a reasonable inference that FCI-Oxford's warden or Lt. Doe had reason to believe plaintiff continued to be at risk of an attack in June of 2011.").  Plaintiff renounced his gang affiliation almost four years prior to the alleged attack and did not suffer any retaliation for doing so during that time.  Although plaintiff

points out that he was transferred out of state between September 10, 2015 and August 4, 2016, he suffered no retribution from his former gang during the year after he renounced his gang affiliation (September 2014 to September 2015) or for the year and a half after his return to the Wisconsin Secure Program Facility in 2016.  Plaintiff also never filed a SPN request to be placed apart from Collins or other Vice Lords members and did not alert or remind staff of the possible risk of harm when Collins was transferred onto the Fox Trot unit on December 21, 2017.  In fact, plaintiff admits that he agreed to speak with Collins on the night of the attack and even voluntarily followed Collins to a more remote area of the unit where they could talk in private.  Without more, a reasonable jury could not conclude that any of the defendants would have been on notice that plaintiff faced a specific and imminent risk of serious harm four years after renouncing his gang affiliation.

2.  Alleged failure to monitor unit

Plaintiff alleges that defendants Saylor and Edwards, who were responsible for monitoring the unit on the night of the incident, failed to protect plaintiff from Collins or intervene to stop him from hurting plaintiff.  His primary argument is that Saylor knew or should have known that a camera monitor was not working in the sergeant's cage.  However, as explained in the fact section above, there is no evidence that Saylor knew about the defective monitor until Edwards notified him that something had happened with Collins. It is also undisputed that Saylor was not responsible for checking the monitors before each shift or repairing any that were down.

Although plaintiff also suggests that the unit was understaffed, Edwards skipped his rounds and an officer was supposed to be sitting on a chair at the end of the range, he has not presented any evidence to support his assertions. It is undisputed that another officer performed the first round for Edwards and that the incident with Collins occurred before Edwards could start the second round. There is some dispute as to whether officers *ever* sat in a chair on the range or at the end of the range inside the prison. However, plaintiff has failed to present any evidence that an officer was *required* to sit in the chair at the end of the range and failed to do so on the night of the alleged attack.

The undisputed evidence shows that both defendants responded promptly after Edwards came upon Collins and saw a blood trail. Collins was secured, additional staff was called and plaintiff was provided necessary medical attention. Accordingly, defendants Saylor and Edwards are entitled to summary judgment as to this aspect of plaintiff's deliberate indifference claim against them.

## B. State Law Negligence

Plaintiff also asserts state law negligence claims against defendants Edwards, Scullion, Esser, Broadbent, Brown and Saylor regarding their alleged failure to protect him. As defendants point out, plaintiff cannot bring a negligence claim under Wisconsin law against a state official without first timely submitting a written "notice of claim" in person or by certified mail on Wisconsin's attorney general within 120 days of the event giving rise to the action. Wis. Stat. § 893.82(3). The notice must state the date, location and circumstances

surrounding the event and the names of the state officers or employees involved.  Id.  It also must be sworn by the claimant and contain a statement showing that the oath or affirmation occurred before a notary.  Wis. Stat. § 893.82(5); Estate of Hopgood ex rel. Turner v. Boyd, 2013 WI 1, ¶ 43, 345 Wis. 2d 65, 84, 825 N.W.2d 273, 283.  Wisconsin requires strict compliance with the notice of claim statute "even though it produces 'harsh consequences.'" Kellner v. Christian, 188 Wis.2d 525, 533, 525 N.W.2d 286, 290 (Ct. App. 1994) (internal citations omitted).

Defendants say that plaintiff failed to comply with the notice of claim statute in three ways:  (1) he mailed his notice on May 22, 2018, more than 120 days after the incident with Collins; (2) he did not make a sworn statement before a notary; and (3) he did not name Saylor or Brown in the notice.  Plaintiff blames his failure to file a timely, notarized notice on the refusal of defendants Kuslits and Giebel to notarize his handwritten claim in early April 2018.  However, even assuming Kuslits and Giebel actively prevented plaintiff from having his notice of claim notarized, plaintiff did not swear to the contents of his April 24, 2018 letter to the attorney general or his May 2018 notice of claim and did not name Saylor or Brown in either document.

Wisconsin has made clear that a claimant must adhere to the notice of claim statute with "exacting care" and that evidence that the notice has been sworn to must be contained in the notice of claim itself.  Kellner, 188 Wis. 2d at 532.  In addition, the only possible exception to the requirement to identify a state employee by name would be if plaintiff exercised reasonable diligence to discover the name of the state employee and then

submitted an amended notice of claim that properly identified him. Sheppard v. Lee, 2019 WL 1765231, at *3 (W.D. Wis. Apr. 22, 2019); Modica v. Verhulst, 195 Wis. 2d 633, 647, 536 N.W.2d 466, 473-74 (Ct. App. 1995). See also Robbins v. Pollard, 2017 WL 876503, at *3 (E.D. Wis. Dec. 11, 2017), aff'd, 734 Fed. Appx. 366, 369 (7th Cir. 2018) (failure to name correctional officer specifically cannot be excused even though defendants allegedly refused to provide plaintiff with officer's name). Plaintiff does not allege that he did not know the identity of Saylor or Brown, and he did not submit an amended notice of claim with respect to either of those defendants. Therefore, plaintiff's negligence claims fail as a matter of state law.

In any event, even if plaintiff had submitted a timely notice of claim that met the requirements of § 893.82 with respect to some of the defendants, his negligence claims fail on the merits. To prevail on a claim for negligence in Wisconsin, plaintiff must prove that defendants breached their duty of care and that he suffered injury as a result. Paul v. Skemp, 2001 WI 42, ¶ 17, 242 Wis. 2d 507, 520, 625 N.W.2d 860, 865. As discussed in conjunction with plaintiff's Eighth Amendment claims, the evidence of record does not suggest that any of the defendants breached a duty of care to plaintiff in this case. Therefore, plaintiff's negligence claims fail for the same reasons as his Eighth Amendment claims.

Accordingly, I am granting defendants' motion for summary judgment with respect to plaintiff's negligence claims against defendants Edwards, Scullion, Esser, Broadbent, Brown and Saylor.

## C.  Access to Courts

The First Amendment right to petition the government for redress of grievances includes the right of access to the courts.  Bridges v. Gilbert, 557 F.3d 541, 553 (7th Cir. 2009).  To prevail on an access to courts claim, plaintiff must show both that "prison officials interfered with his legal materials" and that "the interference actually prejudiced him in his pending litigation."  Devbrow v. Gallegos, 735 F.3d 584, 587 (7th Cir. 2013).  In other words, defendant must have engaged in conduct that caused plaintiff "actual injury," which means the conduct caused plaintiff to lose a lawsuit or the chance to sue on a non-frivolous argument.  Lewis v. Casey, 518 U.S. 343, 350-54 (1996); Christopher v. Harbury, 536 U.S. 403, 413-14 (2002).

Plaintiff alleges that defendants Kuslits and Giebel prevented him from complying with Wisconsin's notice of claim statute because Kuslits refused to notarize his handwritten notice of claim form at Giebel's direction and Giebel never responded to plaintiff's later inquiry about the matter.  However, defendants are correct that Kuslits's and Giebel's alleged misconduct did not cause plaintiff to lose a lawsuit or to sue on a non-frivolous argument.  As discussed above, plaintiff did not file a timely notice and did not name Saylor or Brown, and even if he had done these things, his negligence claims fail on their merit.


## ORDER

IT IS ORDERED that:

1.  Plaintiff Victor Robinson's motion for summary judgment, dkt. #34, is DENIED.

2. The motion for summary judgment filed by defendants Randall Edwards, Matthew Scullion, Dane Esser, Anthony Broadbent, Lebbeus Brown, Cody Saylor, Melanie Kuslits and Cory Giebel, dkt. #49, is GRANTED.

3. The clerk of court is directed to enter judgment accordingly and close this case.

Entered this 8th day of June, 2021.

BY THE COURT:

/s/

_____
BARBARA B. CRABB
District Judge